Filed 12/6/21 (unmodified opinion attached)

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| Y.C.,<br><br>　　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>　　　　Respondent;<br><br>THE PEOPLE,<br><br>　　　　Real Party in Interest. | A162063<br><br>(San Mateo County<br>Super. Ct. No. 20JW0474)<br><br>**ORDER MODIFYING OPINION; AND DENYING PETITION FOR REHEARING**<br>**[NO CHANGE IN JUDGMENT]** |

**THE COURT[*]:**

Petitioner's petition for rehearing, filed November 23, 2021, is denied. Justice Streeter dissents from this denial and would have granted Petitioner's request.

It is ordered that the opinion filed November 8, 2021, be modified as follows:

1.　　On page 12 of the opinion, following the final full sentence, insert as footnote number 5 the following text, and renumber all subsequent footnotes accordingly:

> Citing *Cramer v Tyars* (1979) 23 Cal.3d 131, 137, Y.C. also argues that the Fifth Amendment gives him a right not to be called as a

---

[*]　Pollak, P.J., Streeter, J., Tucher, J. participated in the decision.

1

witness in a criminal case. This is true but irrelevant, as Y.C. has not claimed he was, or will be, called as a witness in any court proceeding.

2.    On page 17 of the opinion:  Delete the final sentence (which carries over to page 18) and subsequent citation, which read:

> Separately, CMIA also authorizes a provider of health care to disclose medical information to a probation officer "or any other person who is legally authorized to have custody or care of a minor for the purpose of coordinating health care services and medical treatment provided to the minor." (Civ. Code, § 56.103, subd. (a).)

Modifications to Justice Streeter's Concurrence and Dissent:

1.    On page 6 of Justice Streeter's concurrence and dissent, in the first full paragraph (which begins: To the extent we are reaching the merits, . . .) immediately after the seventh full sentence (which reads: In my view, BHRS—a public health agency that delivers mental health services to juveniles—is clearly a "covered entity" since it is a "health care provider."), insert as footnote number 6 the following text, and renumber all subsequent footnotes accordingly:

> [6] At pages 31 and 32 of the brief supporting Y.C.'s writ petition, he cites and provides Web addresses for four judicially noticeable government records (Evid. Code, § 452, subd. (c)) as proof of this. One of these documents, published by BHRS and entitled "Mental Health Plan Outpatient Provider Manual," is addressed to BHRS's contracted clinicians for a number of different types of its health services, including "assessment services," which are described as "clinical analysis of the history and current status of the client's mental, emotional or behavioral condition." (San Mateo County Health System Behavioral Health & Recovery Services, Mental Health Plan Outpatient Provider Manual (Dec. 2017) <https://www. smchealth.org/sites/main/files/file-attachments/provider_ manual_ppn_12.26.17_0.pdf> [as of Dec. 3, 2021].) As an orientation to its policies, BHRS advises these clinicians as follows: "It is essential that in your practice you develop, communicate and utilize forms, policies and procedures that are in compliance with HIPAA. We

recommend that you take a HIPAA training at least every two years. [¶] The HIPAA for BHRS Mental Health e-learning course is available free on the county Health System internet site http://smchealth.org." (*Ibid*.) Whether the substance of any of these statements is true and accurate is not what is noteworthy about them. Their significance is in the fact that they contradict the Attorney General's position that HIPAA does not apply here. They also explain why, when asked about her practices in keeping assessments confidential, Ms. Johnson testified that "there's HIPAA involved."

2.     On page 14 of Justice Streeter's concurrence and dissent, in the first full paragraph, delete the first sentence and the citation following it:  If Y.C. had been ordered to participate in a psychological assessment interview (§ 711), he would have enjoyed full use and derivative immunity for any statements made to Ms. Johnson. (*People v. Jablonski, supra*, 37 Cal.4th at p. 803.)

In place of the deleted text indicated above, begin the paragraph with the following substitute language:

> If Y.C. had been referred by the juvenile court for psychological evaluation by a licensed mental health professional (§ 712, subd. (a)(2)), he would have had the right, "with the approval of his or her counsel," to decline the evaluation (§ 711, subd. (b)), and if he had declined to be evaluated, the preparation of the social study for the court in advance of the dispositional hearing would have had to proceed without such an evaluation. (*Ibid*.) It cannot be right that the power the Attorney General now claims Ms. Johnson had—to ask for Y.C.'s consent to a psychological evaluation that would ultimately be provided to the court, without first giving Y.C. the opportunity to obtain the assistance of counsel in deciding whether to proceed—exceeds the power of the court itself.

3.     On page 14 of Justice Streeter's concurrence and dissent, in the first full paragraph, in the sentence immediately following the newly inserted language indicated in item 2 above and continuing in the same paragraph,

3

insert the phrase, "on his own" after the words, "Y.C. may have chosen" so that the sentence reads:

> Y.C. may have chosen on his own to participate in the interview—under duress, and without adequate warning that his statements could be used against him—but unless we recognize his participation as effectively compelled, he was not entitled to full immunity from the use of his statements, "either directly or as a lead to other evidence, to bolster the prosecution's case against the defendant."

There is no change in the Judgment.

Dated:_____          _____
                                      TUCHER, P.J.*

*Y.C. v. Superior Court for the County of San Mateo* (A162063)

_____

 * Presiding Justice of the Court of Appeal, First Appellate District, Division Three, sitting by assignment pursuant to article VI, section 6 of the California Constitution.

| | |
|---|---|
| Trial Court: | San Mateo County Superior Court |
| Trial judge: | Honorable Susan Jakubowski |
| Counsel for petitioner: | Michelle May Peterson<br>Lana M. Kreidie |
| Counsel for amicus curiae on behalf of petitioner | Abigail Trillin, Executive Director<br>Legal Services for Children |
| | Jesse Hahnel, Executive Director<br>National Center for Youth Law |
| | Meredith Desautels, Staff Attorney<br>Youth Law Center |
| Counsel for respondent: | No appearance |
| Counsel for real party in interest: | Xavier Becerra and Rob Bonta<br>Attorneys General of California<br>Matthew Rodriquez<br>Acting Attorney General of California<br>Lance E. Winters<br>Chief Deputy Attorney General<br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br>Seth K. Schalit<br>Supervising Deputy Attorney General<br>Eric D. Share<br>Supervising Deputy Attorney General |

Filed 11/8/21 (see concurring opn.; see concurring & dissenting opn.)
(unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| Y.C.,<br><br>     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN MATEO COUNTY,<br><br>     Respondent;<br><br>THE PEOPLE,<br><br>     Real Party in Interest. | A162063<br><br>(San Mateo County<br>Super. Ct. No. 20JW0474) |

After being detained on assault and firearm charges, 17-year-old Y.C. agreed to participate in a mental health assessment conducted by a family therapist, pursuant to an established protocol of the Juvenile Services Division of the San Mateo County Probation Department. The therapist provided a summary of her interview to the probation department, which included the summary in a report provided to the juvenile court at Y.C.'s detention hearings. In this writ proceeding, Y.C. contends the disclosure of the assessment interview to the probation department and juvenile court, and its use at his detention hearings, violated his constitutional right against self-incrimination and his right to counsel, as well as various privacy rights and privileges.

1

Because, during the pendency of this writ proceeding, Y.C. entered a change of plea and was released from detention, we dismiss his petition as moot to the extent it seeks relief relating to the detention order or to evidence considered at the detention hearings. In all other respects, we deny the petition.

## BACKGROUND

### A. The Charges

On November 10, 2020, the juvenile court issued an arrest warrant for Y.C., then 17 years old. On the same day, the People filed a wardship petition charging Y.C. with three felonies: assault with a firearm (Pen. Code, § 245, subd. (a)(2)); carrying a loaded firearm (Pen. Code, § 25850, subd. (c)(4)); and possession of a firearm by a minor (Pen. Code, § 29610). The first count included a firearm-use enhancement (Pen. Code, § 12022.5, subd. (a)). According to the detention report, Y.C. was alleged to have shot a suspected rival gang member in the leg.

Arrested on November 11, 2020, Y.C. was taken to the Juvenile Assessment Center (Assessment Center), where he met with a probation officer and invoked his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. The probation officer spoke to Y.C.'s mother, who told the probation officer she had been concerned with Y.C.'s behavior. Y.C.'s mother reported that several months earlier, she had approached the Burlingame Police Department for assistance controlling Y.C.'s behavior. The mother indicated to police that she had noticed a " 'black flat thing, that is part of a gun' " in the family home, reprimanded Y.C., and told him to get it out of the house.

### B. The Assessment Center Interview

San Mateo County created its Assessment Center in response to the need for "comprehensive early intervention with at-risk first-time offenders."

The Assessment Center is part of a collaborative effort of the San Mateo County Juvenile Justice Coordinating Council, which brings together the county's probation department, Behavioral Health and Recovery Services (BHRS) agency, sheriff's department, district attorney's office, private defender's office, and judges of the juvenile court.

As part of the Assessment Center program, a multidisciplinary team consisting of a probation officer, nurse practitioner, and psychiatric social worker or therapist makes an intake assessment of a minor taken into custody to determine the minor's risk to the community and whether he or she is in danger. Pursuant to this program, the probation officer referred Y.C. to Linda Johnson, a licensed marriage and family therapist with San Mateo County's BHRS team. The purpose of the referral was for Johnson to assess Y.C.'s needs, formulate a recommendation for a further mental health or substance abuse evaluation, and potentially suggest future treatment.

On November 12, Johnson contacted Y.C. by telephone. At the beginning of the call, Johnson informed Y.C. that he did not have to speak with her and that if he did, the interview would not be confidential and would be disclosed to the probation department and the court. Johnson also told Y.C. that if he chose not to participate, she would report that fact to the probation department and court. Y.C., without counsel, agreed to proceed with the interview.

Johnson spoke with Y.C. for approximately two hours. They did not discuss the charges against Y.C., and no reference to the circumstances leading to his arrest appears in the report Johnson submitted to the probation department. Johnson's report summarized the substance of the interview, discussing Y.C.'s physical and mental health history, including his history of substance abuse. The report described Y.C.'s educational and

3

employment history, and his relationship with his family and friends. Johnson recommended a psychological evaluation to "aid the Court in determining an appropriate disposition and treatment plan" for Y.C. The probation department included Johnson's report in the detention report it submitted to the juvenile court.

## C.    The Detention Hearings

Counsel for Y.C. first appeared in juvenile court on November 13, 2020, for Y.C.'s initial detention hearing. Counsel objected to the court's consideration of Johnson's report, but the court overruled the objection and ordered continued detention for Y.C., determining detention was reasonably necessary for the protection of the person or property of another and that placement in Y.C.'s home was contrary to his welfare. (Welf. & Inst. Code, § 636, subd. (a).)[1] The record does not reflect the factual underpinnings of the court's findings.

The court invited Y.C.'s attorney to file a formal motion to suppress and seal Johnson's report, and scheduled a further hearing to reconsider detention. Counsel then filed a written motion, arguing that the statements Y.C. made to Johnson were obtained in violation of his constitutional rights to counsel and against self-incrimination, and that the inclusion of his statements in the detention report violated the federal Health Insurance Portability and Accuracy Act (HIPAA) and state "privacy rights." Y.C. requested that the court "order the statements excluded from the detention report and that they not be used against [Y.C.] by the government." He also requested that the court seal the detention report and direct the preparation

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

4

of a new detention report without the inclusion of Johnson's interview with Y.C.

At the December 22, 2020 hearing on the motion, Y.C. called Johnson as witness. Johnson testified that her role with the BHRS team is to meet with minors upon their arrival at the Assessment Center "to gather a biopsychosocial history so that we can determine the needs for this youth and their families." Johnson explained, "The things that I look for are treatment issues, resources that they need, history of abuse or neglect. My goal is to help youth who potentially would fall through the cracks otherwise." Johnson said the probation department refers a minor to her for an assessment generally within 24 hours after the minor has first been detained. In most cases, the probation department informs Johnson of a minor's name and date of birth but provides no other details, including the reason for the minor's detention. For minors over 15 years old, Johnson did not contact counsel before conducting an assessment; nor did she inquire whether the probation department had contacted counsel. This was Assessment Center policy at the time of Y.C.'s detention although, as discussed below, that policy changed after an intervening change in state law.

Johnson meets with a minor alone[2]; the probation department does not participate. Johnson begins an assessment by introducing herself and informing the minor that she is to conduct an assessment in order to formulate a recommendation to the juvenile court regarding the need for a further mental health or substance abuse evaluation, and to make suggestions for future treatment. She reads a list of disclosures to the minor,

---

[2] Prior to March 2020, Johnson would meet with minors in person at the Assessment Center. Beginning in March 2020, Johnson began contacting minors by telephone due to restrictions on in-person contact brought on by the COVID-19 pandemic.

including (1) that the information provided by the minor can and will be shared with the probation department and juvenile court, (2) that as a result of the assessment, the BHRS team "will formulate a recommendation to the Court regarding the need for further mental health or alcohol and other drug evaluation, and . . . may make suggestions for future treatment," (3) that the minor may refuse to participate in the assessment, but any refusal must be made known to the probation department and juvenile court; and (4) that the minor may change his mind about participating at any time and refuse to answer specific questions. Johnson does not read a minor his *Miranda* rights and is not informed by the probation department whether the minor has previously invoked his *Miranda* rights.

If a minor chooses to participate, Johnson's interview covers a wide range of categories, including education, family, social history, mental health, physical health, abuse, neglect, trauma history, and alcohol and drug history. Johnson does not ask about the nature of the charged crimes and, if a minor attempts to speak about the charges, Johnson tells the minor to stop.

After interviewing the minor, Johnson formulates a working clinical interpretation that can lead to a provisional diagnosis and additional treatment. She also prepares a written summary of her assessment and provides it to the probation department for inclusion in the detention report. The probation department has no input on the contents of Johnson's summary. Johnson reviews her summary after it has been included in the detention report to ensure its accuracy.

In Y.C.'s case, Johnson explained that she went through the standard disclosures with Y.C., and that he agreed to proceed with the assessment. Johnson testified that Y.C. was "surprisingly forthcoming and open" during the interview and had "good insight for a youth with his history."

6

Following Johnson's testimony and the parties' arguments, the juvenile court denied Y.C.'s motion to seal and suppress. The court observed that the Welfare and Institutions Code "specifically requires that probation do an investigation and provide information to the court and that that investigation includes the circumstances of the minor and the facts surrounding his or her being taken into custody. Part of the way that is done is through the interview" by BHRS. The court explained that the interview with Johnson was "not an interrogation" because not "on an inculpatory basis," and it concluded there was no Fifth Amendment or *Miranda* violation, no due process violation, and no "[S]ixth [A]mendment violation of the right to counsel." Further, the court concluded that because the interview was "provided after an extensive discussion with the minor about how it was going to be used, who was going to see it, and what was going to be done for it," there was no HIPAA violation.

After denying the motion to seal or suppress, the court considered Y.C.'s motion to be released from the Assessment Center pending the disposition of his case. Y.C.'s mother and a family friend both testified on Y.C.'s behalf, explaining that each had a strong relationship with Y.C., that Y.C. was a loving person who had made some poor choices, and that they would work with him to provide necessary care if the court were to release him. The court nonetheless determined, in an order dated December 23, 2020, that detention remained necessary for the protection of the person or property of another, and that placement in the home of Y.C.'s mother would be contrary to Y.C.'s welfare.

### D. Court of Appeal proceedings

On February 22, 2021, Y.C. filed a petition for writ of mandate in this court seeking to vacate the orders denying his motions to seal and suppress

7

and for immediate release. Y.C. also filed a separate motion to seal Johnson's report pending our review of the writ petition. After receiving preliminary briefing, we issued an order to show cause. We denied the motion to seal pending our review of the petition, but observed that the report of Johnson's interview remained confidential pursuant to section 827, which allows only specified persons and entities access to a juvenile case file.

The County of San Mateo filed an application to appear as a real party in interest. We denied the county's application but accepted its proposed opposition to Y.C.'s writ petition as an amicus curiae brief.[3]

On May 5, 2021, the Attorney General filed a motion to dismiss Y.C.'s writ petition as moot. The Attorney General reported that two days earlier Y.C. had pleaded no contest to possession of a firearm by a minor and battery with serious bodily injury, and he was awaiting a dispositional hearing on May 17. The Attorney General argued that Y.C.'s petition was moot because we could no longer grant relief from Y.C.'s pre-adjudication detention. Y.C. opposed the motion and we denied it.

We have since been advised that Y.C. received a disposition of 240 days of confinement, which after application of predisposition credits resulted in further confinement of four days. Y.C. was then released home on juvenile probation subject to ankle monitoring.

---

[3] We overrule Y.C.'s objections to exhibits attached to the amicus brief. Although not considered by the juvenile court, the county resolution creating the BHRS team's Assessment Center procedure, the documents issued by federal agencies regarding application of privacy rules in light of the COVID-19 pandemic, and an executive order from Governor Newsom addressing changes to privacy laws in light of the pandemic, though of limited relevance, are properly subject to judicial notice.

## DISCUSSION

### I. Mootness

The disposition of Y.C.'s delinquency case does not moot the petition before us, but it does substantially narrow the issues we must decide. Y.C. has asked this court to vacate the juvenile court's orders at his detention hearings that deny: (1) the sealing and suppression of statements he made to Johnson, and (2) his release from custody. We agree with the Attorney General that, with Y.C.'s plea of no contest and his release from custody, this court can no longer grant "effectual relief" from the detention order, and Y.C.'s challenge to the order detaining him is accordingly moot. (*Sturgell v. Department of Fish & Wildlife* (2019) 43 Cal.App.5th 35, 43.) Y.C.'s challenge to the sealing and suppression order is, for the same reason, partially moot. To the extent Y.C. argues the statements he made to Johnson should not have been used in deciding whether to detain him, that issue is moot now that he is no longer detained. But the juvenile court's order addressed sealing, as well as suppression, and there the analysis is different.

To the extent Y.C. asks that the report containing his statements to Johnson be sealed, returned, or destroyed to protect his privacy, that issue is not moot. As the United States Supreme Court held in *Church of Scientology of California v. United States* (1992) 506 U.S. 9, 13, when the Government has obtained materials unlawfully, a court can "effectuate relief by ordering the Government to return the records." Although only "a partial remedy," the possibility of an order requiring such relief prevents a case from being moot. (*Ibid.*)

Courts sometimes have discretion to decide an issue even when it is moot, but we decline to do so in this case. A court has the power "to resolve an issue rendered moot by subsequent events if the question to be decided is of

9

continuing public importance and is a question capable of repetition, yet evading review." (*People v. Alsafar* (2017) 8 Cal.App.5th 880, 883, 886.) Courts may review the legality of pretrial detention on this theory because " ' "[p]retrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted." ' " (*Alfredo A. v. Superior Court* (1994) 6 Cal.4th 1212, 1219.) But in this case we are skeptical that the moot issues regarding Y.C.'s pretrial detention are likely to recur because of recent changes to state law and to the policy of the San Mateo County probation department.

When Y.C. was first detained in November 2020, section 625.6 protected only minors who were younger than Y.C. The statute provided: "Prior to a custodial interrogation, and before the waiver of any *Miranda* rights, a youth 15 years of age or younger shall consult with legal counsel in person, by telephone, or by video conference. The consultation may not be waived." (Former § 625.6, subd. (a).)

Consistent with the former statute, the policy of the San Mateo County probation department was to contact counsel for youths before referring them to BHRS only if a minor was 15 years of age or younger. That changed on January 1, 2021 because the Legislature amended section 625.6 so that it applies to all minors. (§ 625.6, subd. (a).) Beginning on January 1, 2021, the probation department amended its policy so that it contacts counsel for all minors, including 16- and 17-year-olds, before referring them to BHRS. Given this change in the probation department's policy, it is unlikely that other youths will raise similar challenges to the inclusion of BHRS interview summaries with their detention reports. We accordingly decline to address those aspects of Y.C.'s petition that are moot.

## II.     Constitutional Claims

Y.C. argues that use of his assessment center interview for any purpose other than health care services violates his Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel.[4] To the extent Y.C. is using these arguments to challenge his detention order or to argue that Johnson's report should not have been considered at the detention hearings, those issues are moot since Y.C. is no longer detained. And to the extent Y.C. is using these arguments to have the summary of his interview with Johnson sealed, returned, or destroyed to protect his privacy, that form of relief is not available for either alleged violation.

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) Compelled statements "of course may not be used against a defendant at trial, [citation], but it is not until their use in a criminal case that a violation of the Self–Incrimination Clause occurs." (*Chavez v. Martinez* (2003) 538 U.S. 760, 767 (plur. opn. of Thomas, J.); see also *id.*, at pp. 777-779 (conc. opn. of Souter, J.); *New York v. Quarles* (1984) 467 U.S. 649, 686 (Marshall, J., dissenting).) Because the privilege is focused on the use of statements during a criminal case, the privilege "does not protect against the *nonpenal* adverse use of officially compelled answers." (*Speilbauer v. County of Santa Clara*

---

[4] While the parties have focused their arguments on the Sixth Amendment's right to counsel, the right to counsel in delinquency proceedings is derived from principles of due process rather than the Sixth Amendment. (*In re Gault* (1967) 387 U.S. 1, 41.) We will presume the right to counsel applies to minors in delinquency proceedings in the same manner as to adult defendants in criminal cases. (See *In re Elijah C.* (2016) 248 Cal.App.4th 958, 964, fn. 5; but see *In re William F.* (1974) 11 Cal.3d 249, 254 ["[t]he right of counsel in juvenile proceedings" is "not necessarily as broad as the right to counsel in criminal proceedings"] disapproved on another point in *People v. Bonin* (1988) 46 Cal.3d 659, 695, fn. 4.)

11

(2009) 45 Cal.4th 704, 715.) Thus, in *Spielbauer*, the Supreme Court held that "a public employee may be compelled, by threat of job discipline, to answer questions about the employee's job performance, so long as the employee is not required, on pain of dismissal, to waive the constitutional protection against criminal use of those answers." (*Id.* at p. 710, italics omitted.) The Fifth Amendment does not prevent compelling an employee's statements, the Court explained. "It simply forbids use of the compelled statements, or the fruits thereof, in a criminal prosecution against the employee." (*Id.* at p. 727.)

Similarly, in *People v. Elizalde* (2015) 61 Cal.4th 523, the Supreme Court held that an un-*Mirandized* statement from a defendant about his gang affiliation, elicited during jail booking, was not admissible in the prosecution's case-in-chief, but also observed that it remains "permissible to *ask* arrestees" questions about gang affiliation during the booking process. (*Id.* at p. 541.) The Court recognized, "[j]ail officials have an important institutional interest in minimizing the potential for violence within the jail population," and they "retain substantial discretion to devise reasonable solutions to the security problems they face. [Citation.] We simply hold that defendant's answers to the unadmonished gang questions posed here were inadmissible in the prosecution's case-in-chief." (*Ibid.*)

What these authorities make clear is that eliciting an unwarned, even an involuntary, statement from a person in custody is not itself a Fifth Amendment violation. It is the use in court proceedings of such a statement that offends the Fifth Amendment. Here, the simple fact of Johnson's interview of Y.C. did not violate the Fifth Amendment, even if use of the interview report during the detention hearing would have (an issue we do not decide because it is moot). The Fifth Amendment is therefore unavailable as

12

a vehicle to order the sealing or destruction of any reference to Y.C.'s statements to Johnson in his case file.

We reach the same result with respect to Y.C.'s right-to-counsel argument, albeit for slightly different reasons. Once Sixth Amendment rights attach, a violation of the right to counsel "occurs when the uncounseled interrogation is conducted." (*Kansas v. Ventris* (2009) 556 U.S. 586, 592.) The right to counsel "renders inadmissible in the prosecution's case in chief statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel." (*Michigan v. Harvey* (1990) 494 U.S. 344, 348.) But a statement that is inadmissible as part of the prosecution's case-in-chief may be used for other purposes. For example, a statement obtained in violation of the right to counsel can be used to impeach the defendant's testimony. (*Ventris*, at p. 594.) In addition, because the right to counsel is "offense specific," a defendant's statements "regarding offenses for which he had not been charged [are] admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses." (*Texas v. Cobb* (2001) 532 U.S. 162, 168.) An uncounseled statement may even be considered at a juvenile disposition hearing, as "there is no statutory or constitutional prohibition on the consideration of illegally obtained evidence at a juvenile delinquency disposition hearing," as long as the evidence is reliable, not obtained as a result of gross or shocking misconduct, and not obtained for purposes of influencing the sentencing court. (*In re Michael V.* (1986) 178 Cal.App.3d 159, 172–173.)

Because there are permissible uses of a statement taken in violation of the right to counsel, it would, once again, be inappropriate to seal or destroy records of such statements so that they could never be considered for any purpose. We do not here decide whether Y.C.'s statements to Johnson could

be used in any particular circumstance, as no other use of the statements is before the court. We simply conclude, now that the challenge to the juvenile court's pretrial detention order is moot, that relief is no longer available for any alleged violation of Y.C.'s right to counsel. Since neither this claim nor Y.C.'s Fifth Amendment claim provides a vehicle for granting the sealing or destruction relief he seeks, we deny (to the extent not dismissed) Y.C.'s writ petition as to both federal constitutional claims.

## III. Federal and State Privacy Laws

Y.C. asserts that disclosure of his assessment interview violated (1) HIPAA and state regulations requiring compliance with HIPAA; (2) California's Confidentiality of Medical Information Act (CMIA); (3) the state constitutional right to privacy; (4) the psychotherapist-patient privilege; and (5) state laws governing informed consent of medical decisions. He asks that we "ensure all documents relating to the Assessment Center interview, and copies thereof, are returned to respondent court without being further read or consulted." He also requests that we order the juvenile court to "seal or destroy those documents."

### A. HIPAA and CMIA

HIPAA "prohibits the unauthorized disclosure or sharing of a person's medical information and imposes civil and criminal penalties on those who do." (*County of San Diego v. Mason* (2012) 209 Cal.App.4th 376, 382.) When it enacted HIPAA, "Congress expressed its concern for protecting the integrity and confidentiality of personal medical records, and for preventing the unauthorized use or disclosure of such records. (42 U.S.C. § 1320d-2(d)(2).)" (*Bugarin v. Chartone, Inc.* (2006) 135 Cal.App.4th 1558, 1561–1562.)

Similar to HIPAA, CMIA "is intended to protect the confidentiality of individually identifiable medical information obtained from a patient by a

health care provider, while at the same time setting forth limited circumstances in which the release of such information to specified entities or individuals is permissible." (*Loder v. City of Glendale* (1997) 14 Cal.4th 846, 859.) "To provide such protection, the act specifies that '[n]o provider of health care shall disclose medical information regarding a patient of the provider without first obtaining an authorization . . .' (Civ. Code, § 56.10, subd. (a)), and then sets forth, in some detail, the requirements of a valid authorization for the release of medical information 'by a provider of health care' (*id.*, § 56.11) or by an employer (*id.*, § 56.21)." (*Loder*, at pp. 859–860.)

Y.C. argues that Johnson failed to follow the authorization and notice requirements in HIPAA and CMIA, rendering disclosure of the assessment in the detention report unlawful under both laws. Specifically, Y.C. argues that Johnson failed to obtain signed, written authorization, as required by both statutes (see 45 C.F.R. § 164.508(c)(1); Civ. Code, § 56.11), and that he was not provided with a "Notice of Privacy Practices" or the opportunity to object to disclosure of the assessment, as required by HIPAA's regulations. (See 45 C.F.R. §§ 164.510, 164.520.) As to CMIA, Y.C. claims that BHRS conditioned its services on his allowing disclosure of the information to the probation department and court, in contravention of Civil Code section 56.37. But Y.C. has not addressed key aspects of HIPAA and CMIA.

Y.C. asserts that BHRS is "plainly a HIPAA covered entity" based on a BHRS policy memorandum describing BHRS's procedure for complying with HIPAA. However, Y.C. overlooks and does not address the portion of the same memorandum stating that disclosure of protected health information by BHRS is mandatory "[t]o the courts, (e.g., to the Juvenile Judge), as necessary for the administration of justice, in accordance with federal and California law." (BHRS memorandum, Confidentiality/Privacy of Protected

15

Health Information (PHI), Feb. 25, 2003, p. 4
<https://www.smchealth.org/sites/main/files/file-
attachments/03.01confidentprivacyphitechedits1.14_0.pdf?1597426118> [as
of Nov. 8, 2021].) More importantly, Y.C. does not address HIPAA's definition
of a "*Covered entity*" set out in title 45 of the Code of Federal Regulations,
part 160.103: a covered entity is a "health plan," a "health care
clearinghouse," and a "health care provider who transmits any health
information in electronic form in connection with a transaction covered by
[HIPAA's regulations]." (45 C.F.R. § 160.103.) These terms each have their
own definition under HIPAA, and Y.C. does not attempt to establish that any
of them encompasses the San Mateo County probation department or BHRS.
We see no way the probation department or BHRS could be considered a
"health plan" or "health care clearinghouse."[5] And assuming, without
deciding, that the probation department or BHRS is a "health care provider,"
we see no indication that either transmitted health information "in
connection with a transaction" covered by HIPAA's regulations. The

---

[5] "*Health plan*" is defined as "an individual or group plan that provides,
or pays the cost of, medical care." The definition provides a non-exclusive list
of 17 types "health plans," such as a group health plan, a health insurance
issuer, an HMO, and a variety of government programs such as Medicare and
Medicaid. A "*Health care clearinghouse*" is a "public or private entity,
including a billing service, repricing company, community health
management information system or community health information system,
and 'value-added' networks and switches, that does either of the following
functions: [¶] (1) Processes or facilitates the processing of health information
received from another entity in a nonstandard format or containing
nonstandard data content into standard data elements or a standard
transaction[;] [¶] (2) Receives a standard transaction from another entity and
processes or facilitates the processing of health information into nonstandard
format or nonstandard data content for the receiving entity." Nothing in the
record before us suggests the probation department and BHRS satisfies these
definitions. (45 C.F.R. § 160.103.)

16

regulations define "*Transaction*" as the "transmission of information between two parties to carry out financial or administrative activities related to health care" (45 C.F.R. § 160.103), which is not something Y.C. claims occurred in this case. We decline to wade further into the regulatory thicket in search of arguments Y.C. might have made to support his HIPAA claim. It is enough to observe that he fails to carry his burden of establishing that the trial court erred when it found no HIPAA violation. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

As for CMIA, it contains a number of exceptions that seem to permit disclosure of Y.C.'s assessment interview to the probation department, juvenile court, and other parties participating in Y.C.'s treatment and care. CMIA permits disclosure of medical information when "specifically authorized by law" (Civ. Code, § 56.10, subd. (c)(14)), a provision that "legitimizes a myriad of situations the Legislature may not have cared to spell out." (*Shaddox v. Bertani* (2003) 110 Cal.App.4th 1406, 1414.) Disclosure of the assessment interview in this case appears authorized by the Welfare and Institutions Code provision requiring a probation officer to "investigate the circumstances of the minor" (§ 628, subd. (a)), and to provide a report to the juvenile court, which the court must consider with any other evidence (Cal. Rules of Court, rule 5.760(a)). Similarly, applicable regulations require the administrator of a juvenile facility to "develop and implement written policies and procedures for assessment and case planning," that allow "for the multi-disciplinary sharing of health information," and "for providing information to the court, child supervision staff and to probation." (Cal. Code Regs., tit. 15, §§ 1355, 1407(a).) Separately, CMIA also authorizes a provider of health care to disclose medical information to a probation officer "or any other person who is legally authorized to have custody or care of a minor for

17

the purpose of coordinating health care services and medical treatment provided to the minor." (Civ. Code, § 56.103, subd. (a).)

Even if HIPAA or CMIA were violated in the manner asserted by Y.C., the "Right to Truth-in-Evidence" provision found in article I, section 28 of our state Constitution prohibits the juvenile court from sealing or destroying the summary of Johnson's interview with Y.C. This constitutional provision provides, in relevant part: "relevant evidence shall not be excluded . . . in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court." (Cal. Const., art. I, § 28, subd. (f)(2).) Our Supreme Court has explained that this provision "was intended to permit [the] exclusion of relevant, but unlawfully obtained evidence, only if exclusion is required by the United States Constitution." (*In re Lance W.* (1985) 37 Cal.3d 873, 890.) Neither HIPAA nor CMIA authorizes a court to exclude otherwise relevant evidence as part of a juvenile delinquency proceeding. (See *Elder-Evins v. Casey* (N.D.Cal., July 3, 2012, No. C 09-05775 SBA (LB)) 2012 U.S. Dist. Lexis 92467, p. *28 [2012 WL 2577589, p. *8] ["HIPAA's general penalty provision, 42 U.S.C. § 1320d-5(a)(1), does not include a suppression remedy," but rather "a civil penalty that can be assessed only against covered entities and their business associates"]; *United States v. Streich* (9th Cir. 2009) 560 F.3d 926, 935 (conc. opn. of Kleinfeld, J.) ["HIPAA does not provide any private right of action, much less a suppression remedy"]; cf. Civ. Code, § 56.35 [listing compensatory damages, punitive damages, and attorney fees as remedy for CMIA violation, in addition to any other remedies available at law].) Nor has Y.C. cited authority holding that the federal Constitution requires exclusion of information obtained in violation of HIPAA or CMIA. Because, as far as we are aware, Y.C. remains on juvenile probation and under the jurisdiction of the juvenile court, the Right to Truth-in-Evidence

18

provision counsels against the court sealing or destroying relevant evidence in his case file. Whether such evidence could be used in any future court proceeding should remain for decision another day.

Finally, we note that section 827 restricts access to juvenile case files to specified persons and entities, balancing the Legislature's belief "that juvenile court records, in general, should be confidential" with its intent "to provide for a limited exception to juvenile court record confidentiality to promote more effective communication among juvenile courts, family courts, law enforcement agencies, and schools to ensure the rehabilitation of juvenile criminal offenders." (§ 827, subd. (b)(1); see also § 827, subd. (a)(1); *In re Gina S.* (2005) 133 Cal.App.4th 1074, 1081.) Tellingly, Y.C. has cited no authority stating that the protections of section 827 are insufficient to protect a youth's privacy rights during or after juvenile court proceedings.

**B.      Right to privacy, psychotherapist-patient privilege, and informed consent**

Y.C. also argues that the disclosure of Johnson's assessment to the probation department and juvenile court violated his state constitutional right to privacy, the psychotherapist-patient privilege, and state laws governing informed consent.

We disagree that the disclosure violated Y.C.'s constitutional right to privacy. The California Constitution does recognize a right of privacy (Cal. Const., art. I, § 1), but the party asserting the right must establish "an objectively reasonable expectation of privacy in the given circumstances." (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 552.) Y.C. could not reasonably have expected that information he provided during the assessment interview would not be disclosed to the probation department or the juvenile court because Johnson explicitly advised Y.C. that any information he shared would be disclosed to the probation department and

19

juvenile court. Johnson also reminded Y.C. that he could stop participating at any time. We recognize that within a short span of time Y.C. was arrested by police, detained at the Assessment Center, brought before a probation officer, and then referred to Johnson for an assessment interview—all undoubtedly stressful for any youth. However, we cannot agree that any uncertainty Y.C. may have had concerning the consequences of participating in the assessment interview changes this basic fact: he had no objectively reasonable expectation that the interview would not be shared with the probation department and the juvenile court.

For similar reasons, we disagree with Y.C. that his interview with Johnson was protected by the psychotherapist-patient privilege. The psychotherapist-patient privilege grants a patient the right to refuse to disclose, and to prevent others from disclosing, a *confidential communication* between himself and a psychotherapist. (Evid. Code, § 1014.) But Johnson's interview with Y.C. cannot be considered a completely confidential communication. She informed Y.C., without qualification, that "[a]ny information disclosed by you during this Assessment can and will be shared with Probation and the Court." She also informed him that she was a mandated reporter, so that if she "suspected that you pose a danger to yourself or others I am also required to report those concerns to the appropriate persons and/or agencies." To the extent that Johnson told Y.C. in advance she would share his statements, those statements are not protected by the psychotherapist privilege. (Accord *People v. Henderson* (1977) 19 Cal.3d 86, 97–98 [defendant interview with jail psychotherapist not confidential when defendant advised of constitutional rights and informed interview was being conducted at request of district attorney], overruled on other grounds by *People v. Flood* (1998) 18 Cal.4th 470, 484.)

20

Last, we conclude that the doctrine of informed consent has no bearing on whether the contents of Johnson's interview should be sealed or destroyed. The doctrine of informed consent "imposes a duty on the physician to provide material information about any proposed treatment, such as risks and alternative procedures." (*Conte v. Girard Orthopaedic Surgeons Medical Group, Inc.* (2003) 107 Cal.App.4th 1260, 1267.) Y.C. claims Johnson failed to inform him about what use the probation department would make of the information he supplied, and failed to explain what rights he had to alternative mental health services or legal assistance. But even if Y.C. could establish that Johnson breached a duty to provide him material information—an issue we do not decide—that breach would not entitle Y.C. to the sealing order he seeks. Y.C. points to the black-letter principle that breach of a professional's obligation to obtain informed consent renders any purported consent void. (Citing *Sheppard, Mullin, Richter & Hampton, LLP v. J-M Manufacturing Co., Inc.* (2018) 6 Cal.5th 59, 87.) But Y.C. fails to explain how this principle translates into a right to the relief he seeks. Nothing in our analysis presupposes that Y.C. provided informed consent to Johnson's interview, so Y.C.'s effort to nullify such consent is beside the point. Although we have established that once Johnson advised Y.C. the contents of his interview would be disclosed to the probation department and juvenile court, it was not objectively reasonable for Y.C. to believe otherwise, that is a different matter.

In sum, none of Y.C.'s statutory or state constitutional claims entitle him to the sealing or destruction order he sought from the juvenile court.

## DISPOSITION

To the extent petitioner seeks relief from the juvenile court's detention order or the court's consideration of the challenged statements during the

21

detention hearings, the petition for writ of mandate is dismissed as moot. In all other respects, the petition for writ of mandate is denied.

TUCHER, P.J.*

I CONCUR:

POLLAK, P.J.

---

* Presiding Justice of the Court of Appeal, First Appellate District, Division Three, sitting by assignment pursuant to article VI, section 6 of the California Constitution.

22

POLLAK, P.J. — I concur but write separately to emphasize that although we do not decide the constitutional issues raised by Y.C. because they are moot as to him, we do not imply that we would agree with his contentions were we to decide them. To the contrary, the constitutional provisions cited by Y.C. are designed to prevent the forced or uninformed disclosure of incriminating information. (See, e.g., *Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fn. 5; *United States v. A.R.* (3d Cir. 1994) 38 F.3d 699, 703–705; *United States v. Mitchell H.* (1999) 182 F.3d 1034, 1035.) Here, in my view, there is no indication that Y.C.'s participation in the interview with a therapist from the county's Behavioral Health and Recovery Services was either compelled or lacking in informed consent,[1] and the interview was designed and implemented to avoid discussion of Y.C.'s alleged offenses or of any potentially incriminating information. The therapist's interview was no more than an extension of the probation officer's interview, designed "not to elicit evidence of guilt — the function of police questioning — but to assist the probation officer in deciding at the outset of the case whether the minor need be further detained pending a court hearing," which our Supreme Court approved in *In re Wayne H.* (1979) 24 Cal.3d 595, 601. There the Supreme Court held that statements made during such an interview "are not admissible as substantive evidence, or for impeachment, in any subsequent

---

[1] The advisement that failure to participate would be reported to the court was hardly a threat. The therapist never stated or implied Y.C. would receive less favorable treatment from the court if he declined to participate, or suggested that he would receive more favorable treatment if he did participate. (See *People v. Holloway* (2004) 33 Cal.4th 96, 116.) Indeed, the therapist could be faulted only if she had failed to make that disclosure. In addition, the therapist interview with Y.C. has no resemblance to the coercive and threatening questioning that was present in other cases in which a minor's statement was found involuntary. (See *In re T.F.* (2017) 16 Cal.App.5th 202, 221; *In re Elias V.* (2015) 237 Cal.App.4th 568, 583–584.)

1

proceeding to determine criminal guilt, whether juvenile or adult," but "may, of course, be admitted and considered in hearings on the issues of detention and fitness for juvenile treatment." (*Id.* at p. 602.)

As to the asserted violation of the Health Insurance Portability and Accountability Act (HIPAA), which I agree does not apply, I would add one observation. Even were the statute applicable, neither the therapist nor the court ran "roughshod" over Y.C.'s rights under its provisions as Y.C. contends. The therapist's failure to obtain a signed, written authorization from Y.C. was a consequence of restrictions on in-person contact at the Juvenile Assessment Center caused by the COVID-19 pandemic. Although the therapist interviewed Y.C. over the telephone, her admonishments covered HIPAA's principal requirements for a valid authorization, including an advisement of the purpose of the interview and identification of the persons to whom disclosure of information would be made. (See 45 C.F.R. § 164.508(c)(1).) Under the circumstances, there was substantial compliance with the HIPAA safeguards.

In short, and without belaboring the arguments, the approach adopted by the San Mateo County Probation Department is well designed to accomplish its legitimate purpose without compromising the minor's rights or violating any statutory or constitutional restrictions. Prompt evaluation of the mental health of a minor taken into custody is to be desired. The therapist in this case breached no duty of loyalty or confidentiality, was fully cognizant of her obligation to avoid eliciting potentially incriminating information from Y.C., and complied with that obligation.

POLLAK, P. J.

2

STREETER, J., Concurring and Dissenting.

The collaborative, multidisciplinary approach San Mateo County took to establishing its Juvenile Assessment Center (the Assessment Center or the Center) appears to have been well intentioned. But no matter how well intentioned in concept, in practice the Assessment Center carries out two functions that are at war with each other. The Center offers detained youth mental health services while at the same time, through the required sharing of information among its constituent members—specifically in this case, the dissemination to a probation officer of a psychologist's assessment of a 17-year-old youth held in custody, charged with felony offenses—it also supports the prosecutorial function carried out by the probation department and the district attorney. Whether Linda Johnson, the department of Behavioral Health and Recovery Services (BHRS) psychologist who conducted the assessment, understood this conflict is beside the point. Wittingly or not, the fact is that her professional duties of loyalty and confidentiality to her young patient were compromised.

If the BHRS saw fit to accommodate some kind of protocol of the probation department by sharing Ms. Johnson's clinical assessment, that does not excuse the resulting violations of law. Nor does the fact that the probation department is a constituent member of the Assessment Center transform the BHRS into an arm of the probation department. Indeed, in her testimony at the detention hearing, Ms. Johnson emphasized that she does not work for the probation department. She said she is "part of the BHRS forensic team." By embedding a clinical psychologist in a collaborative body that also includes the probation department, San Mateo County cannot render inoperative the obligations of confidentiality that arise out of the

1

psychologist's professional responsibility to her patient. Ms. Johnson had the obligation to recommend mental health treatment for Y.C., if warranted; the probation officer had the obligation to pursue his prosecution, if warranted. Because these professional roles are fundamentally incompatible with each other, it was up to Ms. Johnson to level with Y.C. about the potential jeopardy she was putting him in, or at least put him in a position to understand that disclosure of her assessment summary to the probation department might not be in his best interests. For a lawyer in comparable circumstances, we would never tolerate this kind of conflict absent full disclosure and knowing waiver, even for sophisticated clients.

The issues raised in this case are not unique to San Mateo County, or to California. Commentators with expertise in this specialty area have surveyed the problems arising in psychological assessment interviews of minors at the intake stage of juvenile justice systems across the country.[1] One of the unfortunate aspects of the way in which these issues have arisen

---

[1] Lore, *Pretrial Self-Incrimination in Juvenile Court: Why a Comprehensive Pretrial Privilege Is Needed to Protect Children and Enhance the Goal of Rehabilitation* (2009) 47 U. Louisville L.Rev. 439, 442–443, fn. omitted ("Often, children will make self-incriminating statements during the pre-adjudication stage of a juvenile court case while being evaluated or receiving rehabilitative or therapeutic services. . . . [¶] The issue of children making self-incriminating statements at the pre-adjudication stage has grown in importance recently because of the trend within the juvenile justice system to provide earlier screening and assessment . . . , often immediately after arrest, but prior to any official court or attorney involvement. At an initial screening, where children are often assessed for any immediate needs such as mental health or substance abuse problems, [they] are generally unrepresented. This lack of counsel increases the likelihood that they may make self-incriminating statements that could drastically impact their lives."); see Rosado, *Outside the Police Station: Dealing with the Potential for Self-Incrimination in Juvenile Court* (2012) 38 Wash. U. J.L. & Pol'y 177, 182–183.

here is that the objective of making sure psychological assessments are undertaken as an adjunct to the probation department's reporting responsibility to the court—as the lead opinion puts it, to " 'aid the Court in determining an appropriate disposition and treatment plan' " (lead opn., *ante*, at p. 4)—could just as easily be carried out by the Assessment Center as a collaborative endeavor *after* the detention hearing, the point in time when Y.C. was guaranteed the assistance of counsel by statute. (Welf. & Inst. Code,[2] § 634.)[3] Ms. Johnson admitted in her testimony that any urgent need for mental health services prior to the detention hearing can be handled independently, without consulting a probation officer. She also testified that a court order is unnecessary for the provision of urgent services at that point. Thus, it is the timing of the collaboration between BHRS and the probation department that is most problematic here, not the fact of it.

Because only a slight timing adjustment would have brought the Assessment Center into compliance with governing law at no cost to the prompt delivery of mental health services to juvenile arrestees, the issues that have arisen here could have been avoided quite easily. Why all the controversy surrounding this writ proceeding then? That seems plain to see. I would have thought that, by now, all these years after *Miranda v. Arizona*

---

[2] All subsequent statutory references, as in the lead opinion, are to the Welfare and Institutions Code, unless otherwise noted.

[3] Indeed, for youths like Y.C., who the court finds are beyond effective parental control and thus for whom immediate return to their parents is not a viable option, that is exactly what the statutory scheme contemplates. (§ 636.1, subd. (a) ["When a minor is detained pursuant to Section 636 following a finding by the court that continuance in the home is contrary to the minor's welfare and the minor is at risk of entering foster care, the probation officer shall, within 60 calendar days of initial removal, or by the date of the disposition hearing, whichever occurs first, complete a case plan."].)

(1966) 384 U.S. 436 (*Miranda*) and *In re Gault* (1967) 387 U.S. 1, it would be beyond debate that a juvenile accused of a felony has the right to counsel during any custodial interrogation. But apparently not. Although counsel must be appointed for all juvenile arrestees at their detention hearings, for a brief period prior to that point these young arrestees sit in jail unrepresented. At stake here is whether the San Mateo County Probation Department, indirectly through BHRS psychologists, may be given access to uncounseled juvenile arrestees before a lawyer enters the picture.[4]

Which highlights another unfortunate aspect of the case: Because Y.C. has now been released pursuant to an agreed disposition, and because a recent amendment to section 625.6 gives all minors a mandatory, unwaivable right to consult with counsel before submitting to any type of interrogation while in custody,[5] any endorsement of the Center's past practices appears to be pointless. I therefore join the lead opinion in concluding that the case is at least partially moot, and to the extent it is moot, in further concluding that we should decline to apply the recurring-but-evading-review exception to the mootness doctrine. I would go further, however. I think the entire case is

---

[4] The fact that Y.C. was an apparently fully capable 17 year old is of no moment. He was a minor. In 2011, the United States Supreme Court drew attention to how the psychological pressures of custodial interrogation that it warned against in *Miranda* can be especially powerful in breaking the will of a juvenile. (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 272.) The Court's sensitivity to this issue is not new. (See *Gallegos v. Colorado* (1962) 370 U.S. 49, 53–55; *Haley v. Ohio* (1948) 332 U.S. 596, 599–601 (plur. opn. of Douglas, J.).)

[5] Section 625.6, subdivision (a) ("Prior to a custodial interrogation, and before the waiver of any Miranda rights, a youth 17 years of age or younger shall consult with legal counsel in person, by telephone, or by video conference. The consultation may not be waived."). Until January 1, 2021, only youths 15 years of age or younger were covered by this statute.

4

moot and that we should say so, without more. I do not think *Church of Scientology of California v. United States* (1992) 506 U.S. 9, which addresses Article III mootness in the federal courts, compels a contrary conclusion. That case involved a taxpayer's request for return of its own records. The high court observed that "[t]axpayers have an obvious possessory interest" in their records. (*Church of Scientology of California*, *supra*, at p. 13.) The document at issue here is a detention report prepared by the San Mateo County Probation Department. What gave rise to all of Y.C.'s objections, and ultimately to this writ proceeding, is that Ms. Johnson authored a section of the probation department's detention report. I fail to see how that could possibly have given Y.C. a possessory interest in the detention report itself. He could complain about the probation department's use of the detention report, which is what he did via his motion to suppress, but he could not demand it back or have it treated like it was his property, since it was never his.

Because I see no possible basis for any return, sealing, or destruction of records, I do not think we should be issuing what amounts to an advisory opinion on the claims requesting those remedies, since we cannot award effective relief on them. I will say, though, that having concluded we still have a live controversy here to an extent, Presiding Justice Tucher has done an admirable job setting forth an analysis that deftly tacks back and forth from merits discussion to mootness discussion, while keeping our merits rulings relatively narrow. I appreciate that, though I am concerned about the clarity of what we say here, since, at least as to some of the claims, the analysis seems to suggest both that we are rejecting them on the merits *and* that we deem them moot. For an opinion that seeks to garner agreement from two colleagues with polar opposite views on this particular case, as our

5

separate opinions surely demonstrate, I suppose some opaqueness is to be expected.

To the extent we are reaching the merits, explicitly or impliedly, I must dissent. I will comment briefly on only two sections of the lead opinion. First, I would find a violation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) (42 U.S.C. § 1320d et seq.) on this record. HIPAA prohibits a "covered entity" from using or disclosing protected health information. (45 C.F.R. § 164.502(a) (2020).) Covered entities include a "health plan," a "health care clearinghouse," and a "health care provider who transmits any health information in electronic form in connection with a transaction" under HIPAA. (45 C.F.R. § 164.104(a) (2020).) The disclosure of "psychotherapy notes" is specifically mentioned in the regulations as a disclosure for which authorization is required. (45 C.F.R. § 164.508 (2020).) In my view, BHRS—a public health agency that delivers mental health services to juveniles—is clearly a "covered entity" since it is a "health care provider." It violated HIPAA because the information gathered by its employee, Ms. Johnson, was "health information" (42 U.S.C. § 1320d(4)), the disclosure of which was prohibited (42 U.S.C. § 1320d-6) absent patient consent (45 C.F.R. § 164.508 (2020). Patient consent is governed by strict regulatory standards. (See 45 CFR 160.102(a)(3) (2020) [applicability of regulatory standards to a "healthcare provider"].) Ms. Johnson failed to secure Y.C.'s consent in the form of a "valid authorization" written in "plain language" advising Y.C. of the purpose of the disclosure, describing in "specific and meaningful fashion" the information to be disclosed, telling Y.C. his right to treatment was not conditioned on consent to disclosure, and warning Y.C. of the prospect that any disclosed information could lose its protected status under HIPAA. (45 C.F.R. § 164.508(c)(1)(i), (iv), (vi) and

6

(c)(3) (2020).) Nor is there any basis for excusing the failure to obtain an effective consent. The exception for disclosures made in connection with judicial and administrative proceedings—which appears to be what the mandatory governmental disclosure proviso in BHRS's policy memorandum is about—does not apply in the absence of a court order, subpoena or assurance that steps have been taken to secure a protective order. (45 C.F.R. § 164.512(e) (2020).)[6]

Second, under the due process principles enunciated in *In re Gault*, *supra*, 387 U.S. 1, I think Y.C.'s assessment interview violated Y.C.'s privilege against self-incrimination (*Estelle v. Smith* (1981) 451 U.S. 454, 468–469) and right to counsel (*Massiah v. United States* (1964) 377 U.S. 201, 205–206), which means it was error to admit into evidence and consider at the detention hearing the portion of the detention report that set forth Ms. Johnson's summary of Y.C's psychological assessment, just as it would have been error to consider it in the state's affirmative case at a jurisdictional hearing or subsequent criminal proceedings on the same charges. *In re Wayne H.* (1979) 24 Cal.3d 595, a key case relied upon by the Attorney General, and cited by Presiding Justice Pollak as well, is not to the contrary. The appellant in *Wayne H.* received a *Miranda* warning and made a considered choice to

---

[6] Obviously, the BHRS cannot declare an exemption that is broader than the governing regulations allow. And to the extent the lead opinion suggests the BHRS is not covered at all by HIPAA—which is of course inconsistent with BHRS's own policy memorandum concerning its HIPAA compliance practices—I read 45 Code of Federal Regulations part 160.103 (2020) to be directed toward the handling of billing and other support functions carried out by entities that provide services to a "health care provider." That regulation does not govern the core confidentiality standards applicable directly to a "health care provider." Reading the regulations as a whole to apply only to "financial or administrative activities related to healthcare," as the lead opinion apparently does (lead opn., *ante*, at p. 17), has the effect of gutting the statute.

participate in a section 628 interview after being advised of his right to counsel. Y.C. never had that opportunity. Under *Miranda, supra*, 384 U.S. 436, unwarned statements in a custodial interrogation are presumed to have been coerced.

There is no question here that Ms. Johnson's interview of Y.C. took place in a custodial setting. Nor can there be any genuine question about whether the interview qualifies as an "interrogation" for Fifth Amendment purposes. "Interrogation" simply means "questioning" (*Miranda, supra*, 384 U.S. at p. 461), and even without an expressly communicated inquiry, may include "any words or actions" the examiner should know "are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fn. omitted.) The Fifth Amendment privilege "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, *formal or informal*, where the answers might incriminate him in future criminal proceedings.' " (*Minnesota v. Murphy* (1984) 465 U.S. 420, 426, italics added.) The Sixth Amendment guarantee of counsel is equally applicable. Once charges are filed accusing a person of a crime (*People v. Bustamante* (1981) 30 Cal.3d 88, 106–107), there is a Sixth Amendment right to counsel at any "stage of the proceedings [that is] a critical one from [the] defendant's standpoint." (*People v. Horton* (1995) 11 Cal.4th 1068, 1136.) A "critical stage" includes any pretrial event "at which crucial decisions affecting [the defendant's] defense [are] to be made, and where his counsel could [take] steps" toward "protect[ing] and further[ing] [his] substantial rights" (*ibid.*).

For Y.C.—from his standpoint—I believe Ms. Johnson's interview was a "critical stage" of the proceedings against him.[7]

A significant thrust of the Attorney General's argument in opposition to Y.C.'s Fifth Amendment and Sixth Amendment claims, echoed in Presiding Justice Pollak's concurrence, is that Ms. Johnson's assessment interview was part of the probation officer's fact-gathering process under section 628, and that, as a result, *Wayne H.* not only bars the use of any statements in the interview to prove guilt at the jurisdictional hearing but expressly permits their use at the detention hearing. The detention hearing, the Attorney General argues, was a neutral proceeding that did not bear upon guilt. He cites by analogy *United States v. A.R.* (3d Cir. 1994) 38 F.3d 699 and *United States v. Mitchell H.* (9th Cir. 1999) 182 F.3d 1034. These federal cases are problematic for a number of reasons (see *Commonwealth v. Brown* (2011) 26 A.3d 485, 501–502), but the premise of this line of argument collapses if there is no *Wayne H.* use immunity. I say that because *Wayne H.* has no constitutional foundation. Because *Wayne H.* is based solely on an interpretation of section 628 and the statutory scheme of which that provision is part, I doubt its rule of use immunity survived the passage of article I, section 28, subdivision (f)(2) (formerly subdivision (d)) of the

---

[7] When Ms. Johnson visited Y.C., the stakes for him at the detention hearing turned out to be more consequential than he could possibly have known without the assistance of counsel. When finally released, still without a jurisdictional hearing, he had spent six months behind bars, far beyond the presumptive maximum period of 15 judicial days' temporary detention contemplated by the statutory scheme. (§ 657, subd. (a)(2).) That is one of the most troubling aspects of this case. In the circumstances Y.C. faced—whether because of the alleged use of a gun, the alleged involvement of gangs, or some concern about his family ties to a foreign country—he was entitled to counsel to advise him of the potential that he might be deemed a flight risk and a danger to public safety, and kept behind bars for an extended period of time before his case came on for trial.

California Constitution, passed as Proposition 8 in 1982. (Cf. *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802, 806–811 [use immunity for juvenile's transfer hearing testimony and statements to probation officer in advance of that hearing is founded on article 1, section 15 of the California Constitution and is therefore valid under Proposition 8 by virtue of the savings clause for constitutionally based privileges in Evid. Code, § 940].)

It is not the case that, because the questioning at Ms. Johnson's assessment interview concerned only matters relating to Y.C.'s personal life and mental health, we may conclude that nothing Y.C. said in the interview was potentially incriminating. The felony assault and weapons charges in this case alleged that Y.C. shot a gang member. Without revealing any clinical diagnoses or recommendations for treatment set forth in Ms. Johnson's assessment interview summary, suffice it to say that the interview covered a variety of topics concerning Y.C.'s personal background, including his family's immigrant story and some information concerning the nature of his friendships. Together with independent evidence coming from his mother that Y.C. may have been involved with drugs and might have been in possession of a gun, it is not difficult to see how Y.C.'s statements to Ms. Johnson could have been used against him in a case alleging gang involvement.

The issue here is whether there was an incriminatory hazard, not whether there was actual incrimination. "An ordinary witness need not actually prove the existence of an incriminatory hazard, as that would surrender the very protection which the privilege against self-incrimination was designed to guarantee. Instead, the privilege forbids compelled disclosures which could serve as a 'link in a chain' of evidence tending to establish guilt of a criminal offense; in ruling upon a claim of privilege, the

trial court must find that it clearly appears from a consideration of all the circumstances in the case that an answer to the challenged question[s] cannot possibly have a tendency to incriminate the witness." (*Prudhomme v. Superior Court* (1970) 2 Cal.3d 320, 326, disapproved on other grounds in *Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 371–372; see *Hoffman v. United States* (1951) 341 U.S. 479, 486–488.) I am not convinced we can say the assessment interview of Y.C. could not "possibly have a tendency to incriminate" him. That interpretation of the record accepts on faith Ms. Johnson's professed desire only to help this young man, while ignoring the fact that the prosecutor might react to the information in her assessment summary in a wholly different way, and use it to build a case against him.

The lead opinion relies on a line of cases holding there is no Fifth Amendment protection beyond the "core" privilege not to have incriminating statements used adversely in later criminal proceedings. (*Spielbauer v. County of Santa Clara* (2009) 45 Cal.4th 704, 714–715, 727; *Chavez v. Martinez (2003)* 538 U.S. 760, 767–773 (plur. opn. of Thomas, J.); see *Chavez,* at pp. 777–778 (conc. opn. of Souter, J.).) Even under this analysis, the central contention Y.C. makes in this case, that the assessment interview summary should have been excluded at the detention hearing—a contention we say is moot in light of Y.C.'s release, but not moot in light of his request for affirmative relief—qualifies as an attack on a later use of his statements that posed an incriminatory hazard at the detention hearing. At that hearing, Y.C. faced a significant threat to his physical liberty, and along with it the potential stigma of extended incarceration. *Gault* traches that those things are by no means neutral or rehabilitative. (*In re Gault*, *supra*, 387 U.S. at pp. 49–55.) The fact that there may be other, "permissible uses" (lead opn.,

11

*ante*, at pp. 13–14) of Y.C.'s statements to Ms. Johnson does not erase the underlying Fifth Amendment violation.

Notably, moreover, *Spielbauer* and *Chavez* are civil cases in which the prospect of criminal exposure was not immediately in view. *Gault* definitively rejected the idea that juvenile delinquency proceedings are "civil" in nature and thus that there is no possibility of criminal exposure warranting application of the Fifth Amendment. (*In re Gault, supra*, 387 U.S. at pp. 49–55.) And in any event, to the extent the narrow *Spielbauer* and *Chavez* conception of the Fifth Amendment applies in a scenario where criminal charges are pending, our Supreme Court has invoked those cases only where a defendant who knowingly waived his Fifth Amendment privilege had yet to face any questions at all. (See *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1127–1128 [where represented criminal defendant made strategic choice to put his mental state in issue, protective order entered in advance of mental examination sought by prosecution not justified by the Fifth Amendment since scope of defendant's waiver could only be determined at the examination].)

There was no knowing waiver on this record. (See *Miranda, supra*, 384 U.S. at p. 475 ["this Court has always set high standards of proof for the waiver of constitutional rights"]; *Johnson v. Zerbst* (1938) 304 U.S. 458, 464–469 ["intelligent waiver" requires "intentional relinquishment or abandonment of known right or privilege"].) Where there is no waiver and there is clear criminal exposure—or its equivalent, a pending trial in delinquency proceedings—the prophylactic sweep of the Fifth Amendment under *Miranda* extends beyond simple prohibition on direct evidentiary use of compelled statements in the state's case-in-chief on the issue of guilt at

12

trial. It also prohibits the use of such statements outside the courtroom to build a case for guilt.[8]

The lead opinion's citation to *People v. Elizalde* (2015) 61 Cal.4th 523, is no more illuminating than *Spielbauer* and *Chavez*. If anything, that case tends to support Y.C.'s claim of a Fifth Amendment violation here. *Elizalde* holds that, in a case involving gang allegations, the collection of information about gang affiliation, even if gathered for permissible purposes—there, the questions were asked at jail intake in order to ensure the safety of inmates and staff—*does* violate the Fifth Amendment. (*Elizalde*, at pp. 530–532.) "Any number of questions posed to arrestees, such as whether they are injured or under the influence of drugs or alcohol, and how they came to be so, may be *both* necessary and highly incriminating. In-custody defendants generally retain their Fifth Amendment protections even if the police have good reasons for asking un-*Mirandized* questions," the court explained. (*Id.* at p. 536, italics added.) The remedy for this violation, the court held, was suppression of the defendant's "unadmonished answers" at trial (*id.* at p. 540), though the failure to do so in that case was not prejudicial (*id.* at p. 542). My colleagues appear to confuse the issue of whether there was a violation of the Fifth Amendment with the issue of remedy. In this case, it is enough to say that Y.C. is not entitled to the remedy he seeks. Instead, we hold, incorrectly I believe, that there was no violation at all. (Lead opn., *ante*,

---

[8] This is why courts distinguish use immunity from derivative use immunity. See, e.g., *People v. Jablonski* (2006) 37 Cal.4th 774, 803 (holding that the rule of judicially declared immunity for statements made in a compelled mental competency examination fully protects a defendant against any nonevidentiary uses of statements obtained from the defendant during the competency hearing to the same extent he or she is protected by the privilege against self-incrimination).

13

at p. 12 ["the simple fact of Johnson's interview of Y.C. did not violate the Fifth Amendment"].)

If Y.C. had been ordered to participate in a psychological assessment interview (§ 711), he would have enjoyed full use and derivative immunity for any statements made to Ms. Johnson. (*People v. Jablonski, supra*, 37 Cal.4th at p. 803.) Y.C. may have chosen to participate in the interview—under duress, and without adequate warning that his statements could be used against him—but unless we recognize his participation as effectively compelled, he was not entitled to full immunity from the use of his statements, "either directly or as a lead to other evidence, to bolster the prosecution's case against the defendant." (*Maldonado v. Superior Court, supra*, 53 Cal.4th at p. 1125.) The Attorney General cannot have it both ways on this issue. If, as the Attorney General contends, Y.C.'s participation in the assessment interview was voluntary, he enjoyed at most a narrow, statutorily derived use immunity under *Wayne H.* prohibiting the prosecution from seeking later admission of any incriminating statements he made to Ms. Johnson as substantive evidence of guilt of a criminal offense. But *Wayne H.* does not shield him from indirect, nonevidentiary use of anything else that might have bolstered the prosecution's case against him in a later proceeding. And, worse, if the pure use immunity conferred by *Wayne H.* is no longer valid, as I have suggested above is likely the case, then he had no protection at all—even in this juvenile proceeding. These may seem like subtleties, but ultimately they explain why Y.C. faced a significant risk of incrimination in answering questions that seemed both necessary and benign, as the defendant in *Elizalde* did, not just at the detention hearing, but at the jurisdictional hearing and beyond. Y.C. may not have confessed at the assessment interview, but he supplied information that the state was free

14

to use either in building a case for guilt or in arguing he was dangerous enough to justify an extended period behind bars.[9]


STREETER, J.

---

[9] In light of that risk, had there not been an agreed disposition in this case—which moots the issue—I would have favored granting some form of writ relief designed to give Y.C. use and derivative use immunity, affirmatively barring the prosecution from nonevidentiary use of Ms. Johnson's assessment summary in any further investigation of whether he committed the offenses charged against him. The statutory confidentiality and sealing to which he is automatically entitled under section 827 and rule 5.552 of the California Rules of Court do not provide sufficiently broad protection to accomplish that. I mention this in closing because I suspect there is an 800-pound gorilla in the room here: an unstated concern on the part of the BHRS and the probation department that, if counsel for juvenile arrestees were involved, that would disrupt psychological assessment interviews of the kind at issue in this case. A similar concern has been recognized and taken into account by our Supreme Court in comparable circumstances. (*People v. Pokovich* (2006) 39 Cal.4th 1240, 1252.) Going forward here, I see no reason why full use and derivative use immunity could not be conferred by a negotiated protective order applicable to assessment interviews. If that level of protection were granted, the BHRS and the probation department may be surprised to find that defense counsel—who surely understand their paramount duty to protect the welfare of their young clients, as do all other professionals involved in juvenile delinquency proceedings—would not impede or stand in the way of these interviews.

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial judge: | Honorable Susan Jakubowski |
| Counsel for petitioner: | Michelle May Peterson<br>Lana M. Kreidie |
| Counsel for amicus curiae on behalf of petitioner | Abigail Trillin, Executive Director<br>Legal Services for Children |
| | Jesse Hahnel, Executive Director<br>National Center for Youth Law |
| | Meredith Desautels, Staff Attorney<br>Youth Law Center |
| Counsel for respondent: | No appearance |
| Counsel for real party in interest: | Rob Bonta<br>Attorney General of California<br>Matthew Rodriquez<br>Acting Attorney General of California<br>Lance E. Winters<br>Chief Deputy Attorney General<br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br>Seth K. Schalit<br>Supervising Deputy Attorney General<br>Eric D. Share<br>Supervising Deputy Attorney General |

*Y.C. v. Superior Court for the County of San Mateo* (A162063)

16